IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STATE OF WISCONSIN,

      Plaintiff,

      v.                                      Case No. 3:26-cv-401

JOHN D. JOHNSON, SR., in his official capacity as
President of the Lac du Flambeau Band of Lake
Superior Chippewa Indians, GEORGE THOMPSON, in
his official capacity as the Vice President of the Lac du
Flambeau Band of Lake Superior Chippewa Indians,
JAMIE ALLEN, in her official capacity as Secretary of
the Lac du Flambeau Band of Lake Superior Chippewa
Indians, GLORIA COBB, in her official capacity as a
member of the Tribal Council of the Lac du Flambeau
Band of Lake Superior Chippewa Indians, WILLIAM
MITCHELL, SR., in his official capacity as a member of
the Tribal Council of the Lac du Flambeau Band of
Lake Superior Chippewa Indians, KATRINA MARES,
in her official capacity as a member of the Tribal
Council of the Lac du Flambeau Band of Lake Superior
Chippewa Indians, SHANE MITCHELL, in his official
capacity as a member of the Tribal Council of the Lac
du Flambeau Band of Lake Superior Chippewa Indians,
ZACHARY ALLEN, in his official capacity as a member
of the Tribal Council of the Lac du Flambeau Band of
Lake Superior Chippewa Indians, BETTY LOU
WAYMAN, in her official capacity as a member of the
Tribal Council of the Lac du Flambeau Band of Lake
Superior Chippewa Indians, STEPHANIE
THOMPSON, in her official capacity as a member of
the Tribal Council of the Lac du Flambeau Band of
Lake Superior Chippewa Indians, SEDWICK
ARMSTRONG, in his official capacity as a member of
the Tribal Council of the Lac du Flambeau Band of
Lake Superior Chippewa Indians, NADINE POUPART,
in her official capacity as a member of the Tribal

Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians, HUNTER MAYO in his official capacity as the Tribal Fish Hatchery Manager for the Lac du Flambeau Band of Lake Superior Chippewa Indians, ARAIA BREEDLOVE, in her official capacity as a the Public Relations Director for the Lac du Flambeau Band of Lake Superior Chippewa Indians, TJ BILL, in his official capacity as the Chief of Police and the chief law enforcement officer for the Lac du Flambeau Band of Lake Superior Chippewa Indians, and RYAN GAUTHIER, in his official capacity as Chief Conservation Officer for the Lac du Flambeau Band of Lake Superior Chippewa Indians.

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### NATURE OF THE CASE

1. This case involves the Lac du Flambeau Band of Lake Superior Chippewa Indians' attempt to usurp the State of Wisconsin's exclusive authority over the regulation of fishing by nonmembers of the Band in Wisconsin's navigable waters.

2. The Band, through three resolutions passed by its Tribal Council in March and April 2026, purports to prohibit nonmembers of the Band from fishing on nineteen lakes in Vilas and Iron Counties, Wisconsin. The resolutions also purport to prohibit nonmembers from using forward trolling and forward facing sonar on all lakes within the exterior boundaries of the Band's reservation.

3. The Band's resolutions and its attempt to regulate nonmember conduct flout this Court's and the Seventh Circuit's decisions in *State of Wisconsin v. Baker*, 524 F. Supp. 726 (W.D. Wis. 1981), affirmed and modified, 698 F.2d 1323 (7th Cir. 1983).

4. In *Baker*, another band of Chippewa Indians in Wisconsin enacted provisions of a tribal code that "purport[ed] to restrict fishing and hunting in all waters within the Band's reservation." 698 F.2d at 1326.

5. This Court, interpreting the Treaty of 1854 between the Chippewa and the United States, held that "the State of Wisconsin enjoys exclusive sovereignty over the navigable waters lying within the outer boundary of the [band's] reservation . . . with respect to the use of those waters by non-members of the . . . band and Chippewa tribe," and that the band and its officials "lack power to regulate the use of those waters by such non-members." *Baker,* 524 F. Supp. at 733.

6. The Seventh Circuit affirmed, holding that "the 1854 treaty did not convey to the Band sovereignty over navigable waters within its reservation and that exclusive sovereignty over them is in the State." *Baker,* 698 F.2d at 1335.

7. In light of this Court's and the Seventh Circuit's decisions in *Baker*, the Band's recent resolutions are invalid, unlawful, and must be

enjoined before the beginning of Wisconsin's general inland fishing season, which starts on May 2, 2026.

## PARTIES

8.    Plaintiff State of Wisconsin is a sovereign state of the United States.

9.    Defendant John D. Johnson Sr. is the President of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

10.    Defendant George Thompson the Vice President of the Lac du Flambeau Band of Lake Superior Chippewa Indians and is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

11.    Defendant Jamie Ann Allen is the Secretary of the Lac du Flambeau Band of Lake Superior Chippewa Indians, and a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

12.    Defendant Gloria Cobb is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

13.    Defendant William Mitchell Sr. is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

14.    Defendant Katrina Mares is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

4

15. Defendant Shane Mitchell is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

16. Defendant Zachary Allen is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

17. Defendant Betty Lou Wayman is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

18. Defendant Stephanie Thompson is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

19. Defendant Sedwick Armstrong is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

20. Defendant Nadine Poupart is a member of the Tribal Council of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

21. Defendant Hunter Mayo is the Tribal Fish Hatchery Manager for the Lac du Flambeau Band of Lake Superior Chippewa Indians.

22. Defendant Araia Breedlove is the Public Relations Director for the Lac du Flambeau Band of Lake Superior Chippewa Indians.

23. Defendant TJ Bill is the Chief of Police and the chief law enforcement officer for the Lac du Flambeau Band of Lake Superior Chippewa Indians.

24. Defendant Ryan Gauthier is the Chief Conservation Officer for the Lac du Flambeau Band of Lake Superior Chippewa Indians.

25.    All defendants are named and sued in their official capacities as officers, agents, or employees of the Lac du Flambeau Band of Lake Superior Chippewa Indians.

## JURISDICTION AND VENUE

26.    Plaintiff State of Wisconsin brings this action under the Treaty of September 30, 1854, the Second Treaty of La Pointe, 10 Stats. 1109, and the Tenth Amendment to the United States Constitution, to redress violations of that federal treaty and federal law.

27.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and treaties of the United States.

28.    This Court has personal jurisdiction over the Defendants, all of whom are officials of the Lac du Flambeau Band of Lake Superior Chippewa Indians, sued in their official capacities only.

29.    This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

30.    Venue is proper in the U.S. District Court in the Western District of Wisconsin pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiff's claims occurred there.

## ALLEGATIONS

## BACKGROUND REGARDING STATE AND TRIBAL AUTHORITY TO REGULATE NONMEMBERS OF INDIAN TRIBES

31. This case pertains to the Lac du Flambeau Band of Lake Superior Chippewa Indians' assertion of regulatory authority over fishing by nonmembers of the Band in Wisconsin's navigable waters.

32. As used throughout this complaint, "nonmembers" refers to all individuals who are not enrolled members of any the Chippewa Tribes that were parties to the Treaties of 1837, 1842, and 1854.

33. Any authority the Band may exercise over nonmembers exists by virtue of treaties and federal law, as interpreted by the United States Supreme Court and the federal courts.

34. This Court's opinion in *State of Wisconsin v. Baker*, 524 F. Supp. 726 (W.D. Wis. 1981), and the opinion of the Seventh Circuit, 698 F.2d 1323 (7th Cir. 1983), include numerous factual findings and legal conclusions regarding the principal treaty at issue in this case and the Band's and State's respective sovereign authorities.

35. The controlling treaty, known as the Treaty of September 30, 1854, or the Second Treaty of La Pointe ("1854 Treaty"), authorized the creation of a reservation for the Lac du Flambeau Band of Lake Superior Chippewa Indians.

36.    The Lac du Flambeau ("LDF") reservation was authorized by Art. 2. sec. 3d. of the 1854 Treaty. *See United States v. Town of Lac du Flambeau*, 797 F. Supp. 3d 894, 902 (W.D. Wis. 2025).

37.    The parties to the 1837 and 1842 treaties intended to secure to the Chippewa Indians "temporary hunting and fishing rights in common with all citizens." *Baker*, 524 F. Supp. at 731.

38.    The rights enjoyed by the LDF Band in the territory ceded by the 1837 treaty before 1854 were rights in common with all persons. *Id.*

39.    The current LDF reservation is within the area ceded by the 1837 treaty. *Id.*

40.    The primary objectives of the United States in the 1837 and 1842 treaties were to acquire title to Chippewa lands in northern Wisconsin (and elsewhere) and to open those lands to settlement and for economic purposes, including lumbering and mining. *Id.*

41.    The primary objective of the Lake Superior Chippewa in the 1854 Treaty negotiations was to secure permanent homes at each of the present reservation locations. *Id.*

42.    The Chippewa representatives at the 1854 Treaty negotiations understood that they were selling lands they had previously inhabited, and that thereafter they would be restricted to their respective reservations. *Id.*

43.     Pursuant to art. 2 of the 1854 Treaty with the Chippewa, the United States set apart reservations "for the use of the Chippewas of Lake Superior," including the LDF Band. *Baker*, 524 F. Supp. at 731.

44.     As this Court found in *Baker*, at the time of the 1854 Treaty, most Chippewa at the time "had a clear understanding of the ownership concept of land and the fact that by the 1854 treaty actual title to remaining Chippewa land was being conveyed with no reserved rights." *Id.* at 732.

45.     In the years since the establishment of the LDF reservation, the State of Wisconsin has regulated nonmember conduct on navigable waters within the boundaries of the LDF reservation. *Id.*

46.     The State's regulation of nonmembers has included and does include (but is not limited to) regulating fishing by nonmembers on Wisconsin's navigable waters within the boundaries of the LDF reservation. *Id.*

47.     The State of Wisconsin enjoys exclusive sovereignty and jurisdiction to regulate hunting, trapping and fishing activities by non-members of the LDF Band on and in the navigable waters lying within the boundaries of the LDF Reservation. *Id.* at 733, 735.

48.     Just as this Court concluded in *Baker* as to the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, the LDF Band lacks the authority to regulate nonmember fishing on navigable waters within the State of

9

Wisconsin, including waters located within the boundaries of the LDF reservation. *Id.* at 733.

49.    By extension, Defendants—all of whom are officials of the LDF band sued in their official capacities—lack authority to regulate nonmember fishing on navigable waters within the State of Wisconsin, including waters located within the boundaries of the LDF reservation. *Id.* at 733.

## STATE-TRIBAL COORDINATION ON RESOURCE MANAGEMENT WITHIN NORTHERN WISCONSIN

50.    The State of Wisconsin and the Chippewa Tribes have established a long-term process for communicating about and cooperating regarding the management of natural resources outside of the Tribes' reservations. *See generally Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin* ("*LCO III*"), 653 F. Supp. 1420 (W.D. Wis. 1987); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin* ("*LCO X*"), 775 F. Supp. 321 (W.D. Wis. 1991).

51.    Under this Court's decisions in the *Voigt* case, no. 74-cv-313 (W.D. Wis.), as affirmed by the Seventh Circuit, the State of Wisconsin "will continue to bear the responsibility and authority for the management of all of the natural resources of the state except as provided [in this Court's decisions in the *Voigt* case]." *LCO X*, 775 F. Supp. at 323.

52.    This Court's judgment in *Voigt* "is binding on the members of the plaintiff tribes as well as on the plaintiff tribes." *LCO X*, 775 F. Supp. at 325.

53.    The LDF Band is a party to the *Voigt* litigation and has been party to ongoing stipulations between the parties related to the management of natural resources.

## THE BAND'S PREVIOUS ATTEMPT TO LIMIT NONMEMBER FISHING

54.    On August 22, 2022, the Band issued Resolution Number 269(22).

55.    That resolution purported to close a single lake, Flambeau Lake, to nonmember fishing for walleye and musky.

56.    Resolution 269(22) was issued toward the end of the general inland fishing season.

57.    Resolution 269(22) was based on the Band's alleged concerns about the viability of walleye and musky populations in Flambeau Lake.

58.    When State officials learned of Resolution 269(22), they contacted LDF officials to discuss the applicability of the resolution to nonmembers and how the parties might address the Band's resource protection concerns.

59.    In response to Resolution 269(22) and conversations between State and LDF officials, State officials issued communications to the public confirming that state fishing regulations remain in effect, while urging anglers

11

to consider respecting the Band's request to not harvest walleye and musky in Flambeau Lake.

60. There is no record of the Band attempting to enforce Resolution 269(22) against any nonmember anglers.

61. Flambeau Lake has seen marked increases in walleye and musky populations, starting before 2022 and continuing to the present, despite the lack of any enforcement of Resolution 269(22)'s purported limitation on nonmember fishing.

## THE BAND ISSUES RESOLUTIONS 8(26) AND 119(26)

62. On March 30, 2026, the LDF Band issued a media release announcing that it's Tribal Council had approved Resolution Number 8(26).

63. According to the media release, nine named lakes were "closed to walleye and musky fishing by non-members until the Lac du Flambeau Tribal Fish Hathery determines that the lakes may be reopened." The media release also announced that the "Tribal Council has approved a ban on forward trolling by non-members on all lakes within the reservation boundary."

64. On April 14, 2026, the LDF Band, through its Tribal Council, issued Resolution Number 119(26) amending Resolution 8(26). (Attached as Ex. A.)

65. Resolution 119(26) added ten additional lakes as closed to walleye and musky fishing by nonmembers and added a prohibition on the use of

12

"forward facing sonar" by non-members on all lakes within the reservation boundary. (Ex. A:1.)

66. The Resolution referred to a report by the LDF Tribal Fish Hatchery. (Ex. A:1.)

67. According to the Resolution, the Tribal Fish Hatchery report "request[ed] the closure" of nineteen Wisconsin lakes "to Walleye and Musky fishing by non-members until the Tribal Fish Hatchery determines a time at which [the listed lakes] may be re-opened."

68. Also according to the Resolution, the Tribal Fish Hatchery Report recommended "banning" nonmembers from using "forward trolling and forward-facing sonar on all lakes within the reservation boundary," on the theory that "these methods allow[ ] for an unfair advantage that contributes to overfishing/overharvesting." (Ex. A:1.)

69. "Trolling" refers to fishing by trailing any lure, bait or similar device that may be used to attract or catch fish from a boat propelled by a means other than drifting, pedaling, paddling, or rowing. In Wisconsin, the number of lines that may be used while trolling is regulated by s. NR 20.15(4), Wis. Admin. Code.

70. "Forward trolling" is a type of trolling that occurs when the boat moves in a bow-forward direction.

71.    "Forward-facing sonar" refers to a live-imaging sonar technology used by anglers that provides real-time views of fish, habitat structure, and lures.

72.    The use of forward trolling and forward-facing sonar is not restricted by Wisconsin law.

73.    The LDF Tribal Council reviewed the Tribal Fish Hatchery report and accepted the recommendations of that report. (Ex. A:1.)

74.    Through Resolution 119(26), the Tribal Council "approve[d] the closure of [the listed lakes] to Walleye and Musky fishing by non-members until the Tribal Fish Hatchery determines a time at which the Lake may be re-opened." (Ex. A:1.)

75.    Through Resolution 119(26), the Tribal Council also "approve[d] banning forward trolling and forward-facing sonar on all lakes within the reservation boundary by non-members" based on the conclusion that "these methods allow[ ] for an unfair advantage that contributes to overfishing/over harvesting." (Ex. A:2.)

76.    Resolution 119(26) was approved by the affirmative vote of ten members of the LDF Tribal Council. (Ex. A:2.)

77.    Resolution 119(26) "has not been rescinded or amended in any way." (Ex. A:2.)

78.    Despite efforts by multiple State of Wisconsin officials, the Wisconsin Department of Natural Resources did not obtain a copy of Resolution 119(26) until April 22, 2026.

79.    On information and belief, LDF officials intend to enforce Resolution 119(26) against nonmembers who attempt to fish for walleye or musky in any of the nineteen lakes identified in the Resolution.

**WISCONSIN OFFICIALS COMMUNICATE WITH LDF OFFICIALS REGARDING REQUESTS TO RESCIND RESOLUTION NUMBER 119(26)**

80.    In the time since State officials received a copy of Resolution 119(26), officials from the Wisconsin Department of Natural Resources and the Office of Wisconsin Governor Tony Evers have been in communication with representatives of the LDF Band.

81.    On April 27, 2026, Secretary of the Wisconsin Department of Natural Resources Karen Hyun and Secretary's Director James Yach met with LDF Tribal Council members to formally request that the Council rescind Resolution 119(26).

82.    Secretary Hyun and Secretary's Director Yach discussed with LDF representatives the Band's motivations underlying the adoption of the Resolution.

83.    Secretary Hyun and Secretary's Director Yach also discussed with LDF representatives the Tribal Council's understanding of its authority to regulate fishing by nonmembers on Wisconsin's navigable waters.

84.    LDF representatives stated that they believed they are authorized to regulate nonmember fishing based on the Band's Tribal Conservation Code.

85.    The Band's bylaws authorize the Tribal Council to, among other things, "to protect and preserve the tribal property, wildlife, and natural resources of the Lac du Flambeau Band of Lake Superior Chippewa Indians," and "to protect the health, security, and general welfare of the Tribe." (Ex. A:1.)

86.    No nonmembers of the Band were authorized to vote on the Band's adoption of its bylaws.

87.    No nonmembers of the Band were allowed to participate in any election for members of the Tribal Council.

### THE BAND ISSUES RESOLUTION 131(26)

88.    Following communications between State officials and LDF officials, the Band, on April 27, 2026, issued Resolution 131(26). (Ex. B.)

89.    Resolution 131(26) copies much of the substance of Resolution 119(26), including purporting to close nineteen lakes "to Walleye and Muskellunge fishing by non-members," and purporting to "ban[ ] forward trolling and forward-facing sonar on all lakes within the reservation boundary by non-members." (Ex. B:3.)

16

90.    Resolution 131(26) includes additional allegations relating to the authority of the Tribal Council to act under the Band's Constitution and Bylaws. (Ex. B:1–2.)

91.    Resolution 131(26) also includes assertions relating to the importance of walleye and musky to the Band, including that "the Tribe's ability to regulate and manage the Walleye and Muskellunge for the benefit of its members and the Reservation ecosystem is a core aspect of the Tribe's political integrity." (Ex. B:2.)

92.    Resolution 131(26) asserts that the Band's "Nonmember Conservation Code" authorizes the Tribe to "declare closed seasons for fishing by nonmembers for such period of time as the Committee may deem necessary for conservation purposes." (Ex. B:2.)

93.    Resolution 131(26) acknowledges that the Band "has no means to collect data on non-member [fish] harvest" from State waters, but also alleges that "unregulated non-member fishing therefore undermines the Tribe's conservation efforts." (Ex. B:3.)

94.    Resolution 131(26) refers to an "attached report" from the Tribal Fish Hatchery. (Ex. B:3.)

95.    The copy of Resolution 131(26) that was provided to the State did not include any attachment.

17

96.    On information and belief, the Tribal Fishery report referred to in Resolution 131(26) is an eight-page paper consisting of seven short paragraphs of text, twelve photographs, and two charts relating to 2025 walleye population estimates for six Wisconsin lakes located within the Band's reservation boundaries.

97.    Resolution 131(26) states that it was "duly adopted" by the Tribal Council and that "said resolution has not been rescinded or amended in any way." (Ex. B:4.)

98.    On information and belief, LDF officials intend to enforce Resolution 131(26) against nonmembers who attempt to fish for walleye or musky in any of the nineteen lakes identified in the Resolution or who engage in forward trolling or use forward facing sonar on any lake within the reservation boundary.

## WISCONSIN'S GENERAL INLAND FISHING SEASON

99.    Wisconsin's 2026–27 general inland fishing season starts on May 2, 2026.

100.    To fish on Wisconsin lakes, Wisconsin residents who are age 16 and older must purchase a Wisconsin fishing license.

101.    To fish on Wisconsin lakes, nonresidents who are age 16 and older must purchase a nonresident fishing license.

102. Fishing on inland waters in Wisconsin is governed by detailed statutes enacted by the Wisconsin Legislature and approved by the Governor of Wisconsin; as well as comprehensive regulations adopted by the Wisconsin Department of Natural Resources.

103. These include Wis. Stat. chs. 23 and 29 and Wis. Admin. Code NR ch. 20.

104. Wisconsin's fishing regulations are summarized each year in the "*Guide to Wisconsin Hook and Line Fishing Regulations, 2026-2027*" (available at https://widnr.widen.net/s/glhqr9znsp/fishingregselectronic2627).

105. Following opening weekend, fishing on the Wisconsin lakes within the boundaries of the LDF reservation typically remains consistent throughout the spring and summer.

## RISKS TO PUBLIC SAFETY CAUSED BY THE 2026 RESOLUTIONS

106. Wisconsin law enforcement officials have identified multiple risks to public safety arising from the Band's 2026 Resolutions.

107. These risks include conflicts at boat landings, conflicts on the water, and general unrest in the communities near the Wisconsin lakes addressed in the Band's Resolution.

108. Law enforcement officials from the DNR expect there to be significant public confusion from the Band's Resolutions.

19

109. Any confusion will be amplified in the event tribal law enforcement attempts to take any enforcement action.

110. Because Wisconsin-licensed anglers understand that DNR is the primary regulatory authority over fishing in Wisconsin, some anglers may disregard tribal entities or officers who attempt to take enforcement action based on the Resolutions.

111. There also is a risk of confrontation between Wisconsin-licensed anglers, tribal law enforcement, and members of the public, both tribal and non-tribal.

112. For example, many Wisconsin anglers are aware of Wisconsin's anti-harassment law for hunters, anglers, and trappers, Wis. Stat. § 29.083.

113. That law prohibits "[i]mpeding or obstructing a person who is engaged in lawful hunting, fishing or trapping." Wis. Stat. § 29.083(2)(a)2.

114. The anti-harassment law provides for civil remedies, as well as forfeitures against the offending party. Wis. Stat. §§ 29.083(4), .969(11r).

115. DNR wardens have expressed concern that if nonmember anglers are subjected to enforcement action by the Tribal law enforcement, the nonmembers may call on conservation wardens or other Wisconsin law enforcement officers to enforce the anti-harassment law.

116. Given the public rights against interference with lawful fishing, an enforcement stop conducted by tribal officers could escalate into a more serious

interaction between Wisconsin-licensed anglers and tribal law enforcement, or members of the public.

117. Conflicting enforcement actions by law enforcement officials from multiple jurisdictions creates a risk of confusion and potential threats to safety of all parties involved.

118. Wisconsin law enforcement officials believe that the Band's Resolutions relating to nonmember fishing create a heightened risk of unpredictable behavior, potential confusion, conflict, and a potentially unsafe environment for anglers, law enforcement, and the public.

## CLAIMS FOR RELIEF

**I.    Count I: The Band's 2026 Resolutions violate the Treaty of 1854, 10 Stats. 1109.**

119. Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth therein.

120. Under the 1854 Treaty, Defendants have no right to regulate fishing by nonmembers in navigable waters within Wisconsin, including those navigable waters located within the boundaries of the Band's reservation.

121. In the 1854 Treaty, the United States did not intend to, and did not in fact, divest Wisconsin of its sovereign authority over non-Indians on

21

Wisconsin's navigable waters located within the boundaries of the Band's reservations. *See Baker*, 698 F.2d at 1334–35.

122.    The 1854 Treaty did not grant the Chippewa Indians, including the Band, any authority to regulate fishing by non-Indians in Wisconsin's navigable waters, including those State waters located within the boundaries of the Band's reservation. *Id.* at 1335.

123.    The Band's Resolutions 8(26), 119(26), and 131(26) violate the limited powers granted to the Chippewa under the 1854 Treaty, as interpreted by this Court and the Seventh Circuit in *Baker*.

124.    Because the Band "was powerless to" restrict the rights and privileges of non-Indians as to fishing on Wisconsin's navigable waters, the Band was likewise "powerless" to convey such authority to any of the Defendants.

125.    Defendants therefore do not enjoy sovereign immunity for their actions of passing or enforcing Resolutions 8(26), 119(26), and 131(26). *Baker*, 698 F.2d at 1332; *Ex Parte Young*, 209 U.S. 123, 160 (1908).

126.    Defendants' actions of passing, threatening to enforce, and enforcing Resolutions 8(26), 119(26), and 131(26) violate the 1854 Treaty, are unlawful, and must be enjoined.

**II.    Count II: The Band's 2026 Resolutions violate the Tenth Amendment.**

127. Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth therein.

128. The Constitution "allows a State to exercise jurisdiction in Indian Country." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 636 (2022).

129. "Indian country is part of the State, not separate from the State," and while "federal law may preempt that state jurisdiction in certain circumstances," generally, "as a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country." *Id.* (citing U.S. Const., Amdt. 10.)

130. This means that a State is generally "entitled to the sovereignty and jurisdiction over all the territory within her limits." *Id.* (quoting *Lessee of Pollard v. Hagan*, 3 How. 212, 228 (1845)).

131. The States' retained sovereignty means that Indian "reservations are part of the State within which they lie," and the State's "laws, civil and criminal, have the same force therein as elsewhere within her limits, save that they can have only restricted application to [tribal members]." *Id.* (quoting *Surplus Trading Co. v. Cook*, 281 U.S. 647, 651 (1930)).

23

132. The Band's Resolutions 8(26), 119(26), and 131(26) infringe on Wisconsin's sovereign authority, retained under the Tenth Amendment.

133. Defendants' actions of passing, threatening to enforce, and enforcing Resolutions 8(26), 119(26), and 131(26) violate the Tenth Amendment, are unlawful, and must be enjoined.

## III. Count III: Declaratory judgment, 28 U.S.C. §§ 2201–02: The Band lacks regulatory authority over non-member fishing in Wisconsin's navigable waters located within the boundaries of the reservation.

134. Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth therein.

135. As recognized in *Montana v. United States*, 450 U.S. 544, 564–67 (1981), Indian tribes generally lack inherent sovereignty over "nonmembers of the tribe."

136. While tribes retain "inherent power" over most matters internal to tribal operations, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id*. at 565.

137. Unless a tribe is expressly authorized by Congress to exercise authority over non-members, tribes generally lack such authority. *Id*. at 564–65.

138. This rule is subject to two, narrow exceptions. *Id*. at 564–66.

24

139. First, a "tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* at 565.

140. Second, a "tribe *may* also retain inherent power to exercise civil authority over the conduct of non-Indians *on fee lands* within its reservation *when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.*" *Id.* at 565 (emphasis added).

141. Neither exception authorizes the Band's 2026 Resolutions.

142. The Band's Resolutions do not come within *Montana*'s first exception because nonmembers fishing on Wisconsin lakes do not enter a consensual commercial or licensing relationship with the Band, since nonmembers are not required to obtain a tribal license to fish on Wisconsin lakes, including those lakes within the boundaries of the Band's reservation.

143. The Band's Resolutions do not come within *Montana*'s second exception because the Resolutions do not purport to regulate the conduct of non-Indians on fee lands within the Band's reservation.

144. Rather, the Resolutions purport to regulate and prohibit nonmember conduct that occurs exclusively on navigable waters.

145. Navigable waters and the lands underlying them "belong to the state in its sovereign capacity" and are presumed not to have been transferred to Indian tribes through any treaties unless there is unquestionably clear authority indicating such a transfer. *United States v. Holt State Bank*, 270 U.S. 49, 54, 58–59 (1926).

146. The Band's Resolutions do not come within *Montana*'s second exception for another, independent reason, which is that the Resolutions are not based on any showing of necessity to protect against a "direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 565.

147. This exception has been narrowly construed as authorizing tribal regulation of nonmembers only where "non-Indians' 'conduct' . . . do[es] more than injure the tribe." *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 341 (2008).

148. To support a tribe's exercise of regulatory authority over nonmembers under *Montana*'s second exception, the nonmembers' conduct "must 'imperil the subsistence" of the tribal community," i.e., "tribal power must be necessary to avert catastrophic consequences." *Id.* (quoting F. Cohen, *Handbook of Federal Indian Law* § 4.02(3)(c), p. 232, n.220 (2005 ed.)).

149. The Band's Resolutions do not meet this "elevated threshold" for regulatory authority. *Id.*

150. The Resolutions do not even purport to rely on any "catastrophic consequences" that would support the Band's usurpation of State exclusive authority over fishing on Wisconsin's navigable waters within the boundaries of the reservation.

151. The Band's two- and four-page resolutions make no showing of catastrophic consequences that have occurred or are likely to occur that would support the Band's purported prohibition on nonmember fishing.

152. On information and belief, the Band's Tribal Fish Hatchery report makes no such showing of catastrophic consequences that have occurred or are likely to occur to support the Band's purported prohibition on nonmember fishing.

153. Even accepting, for argument's sake only, that the Band's resolutions made *any* factual showing of adverse consequences that could justify limitations on fishing in Wisconsin's navigable waters, the fact that the Resolutions do not limit Band members' fishing demonstrates that any such adverse consequences is purely pretextual.

154. The Band's Resolutions therefore unlawfully seek to regulate nonmember conduct and are not authorized by the Band's "inherent sovereignty."

155. Because the Band "was powerless to" restrict the rights and privileges of non-Indians as to fishing on Wisconsin's navigable waters, the

Band was likewise "powerless" to convey such authority to any of the Defendants.

156. Defendants therefore do not enjoy sovereign immunity for their actions of passing or enforcing Resolutions 119(26) and 131(26). *Baker*, 698 F.2d at 1332; *Ex Parte Young*, 209 U.S. 123, 160 (1908).

157. Defendants' actions of passing, threatening to enforce, and enforcing Resolutions 119(26) and 131(26) are unlawful, and must be declared in excess of tribal authority.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

A.     Declare LDF Resolutions 8(26), 119(26), and 131(26) invalid, unenforceable, and null and void;[1]

B.     Enjoin Defendants from enforcing, implementing, or otherwise effectuating LDF Resolutions 8(26), 119(26), and 131(26);

C.     Enjoin Defendants from interfering with fishing by nonmembers of the LDF Band;

---

[1] In Resolution 131(26), the Band refers to its 2022 resolution purporting to close Flambeau Lake to fishing. Through its conduct in the intervening four years, the Band appears to have abandoned that 2022 resolution. However, if the Band indicates any intent to enforce that resolution, it, too, should be declared invalid and unenforceable for the same reasons as the 2026 Resolutions.

D.     Grant immediate, preliminary injunctive relief against the enforcement of LDF Resolutions 8(26), 119(26), and 131(26)

E.     Award Plaintiff costs, expenses, and reasonable attorneys' fees; and

F.     Grant such other relief as the Court deems just and proper.

Dated this 29th day of April 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

BRIAN P. KEENAN
Assistant Attorney General
State Bar #1056525

Attorneys for State of Wisconsin

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904 (GJK)
(608) 266-0020 (BPK)
(608) 294-2907 (Fax)
gabe.johnson-karp@wisdoj.gov
brian.keenan@wisdoj.gov

29