IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STATE OF WISCONSIN,

Plaintiff,

v.

JOHN D. JOHNSON, SR., *et al.*,

Defendants.

OPINION and ORDER

26-cv-401-wmc

---

Approximately one month before the opening of fishing season, the Lac du Flambeau Band of Lake Superior Chippewa Indians ("the Band") began to assert regulatory authority over fishing by non-members of any Chippewa Tribe ("non-members") on specific navigable waters located completely within the Band's territorial limits. The Band claims to be exercising its inherent sovereign authority and acting on its obligations under tribal law to protect and conserve muskellunge and walleye, both culturally significant and treaty-protected species whose populations have been declining on lakes within the Lac du Flambeau Indian Reservation. The State of Wisconsin disagrees, contending that it has exclusive authority to regulate hunting and fishing by non-members on navigable waters under controlling Seventh Circuit caselaw. Specifically, in *State of Wisconsin v. Baker*, 698 F.2d 1323 (7th Cir. 1983), that court addressed a nearly identical dispute between the State and the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, holding that the State has "exclusive sovereignty over" all navigable waters within Wisconsin, including those on tribal lands. *Id*. at 1336.

In conjunction with bringing this lawsuit against the tribal officials responsible for passing and then expanding these fishing restrictions on non-members, the State filed a motion for a temporary restraining order and preliminary injunction to prevent defendants from

enforcing the tribal council's recent resolutions.  After holding a telephonic hearing, the court

granted a temporary restraining order (dkt. #26), and set briefing on the State's preliminary

injunction motion.  Following an evidentiary hearing and oral argument on that motion held

on May 29, 2026, the court will grant the State's motion for preliminary injunctive relief for

the reasons explained below.

BACKGROUND[1]

The Lac du Flambeau Indian Reservation was established in 1854 as part of the "Treaty

with the Chippewas."  The Band's tribal reservation is roughly 87,195 acres, with nearly half

of that consisting of lakes, rivers and wetlands.  The Band's existence is intertwined with and

reliant on the ecosystem of its homelands, with tribal members using the natural resources for

cultural, ceremonial, subsistence and recreational practices.  Walleye and muskellunge are both

significant to the Band for several reasons, including as predators critical to the ecosystem and

as basic food sources for tribal members who continue to practice traditional methods of

spearing and netting fish.  The walleye in particular is even considered a "clan relative" to the

Band.

The Band's Natural Resources Department manages water quality for its reservation

waters and operates a Tribal Fisheries and Fish Culture Program, maintaining its own fish

hatchery to stock these waters and conducting fish population studies.  In recent years, the

Band's fish hatchery is the only entity currently stocking lakes on the reservation.  Subject to

approval by Tribal Council, the Band's Natural Resources Department also provides

---

[1] These background facts are based on the State's proposed findings of fact in support of their
motion for preliminary injunction (dkt. #8), the Band's responses to those findings (dkt. #18),
and the evidence in the record.

recommendations to the Lac du Flambeau Tribal Council for closing reservation waters from nonmember fishing activity to conserve fish resources.

In March 2026, Hunter Mayo, the Band's Fish Hatchery Manager, as well as other members of the Band's Conservation Code Committee, recommended to the Tribal Council that certain lakes entirely within the reservation be closed to non-members for walleye and muskellunge fishing during the 2026 fishing season, and that non-member use of forward trolling and forward-facing sonar be prohibited on all lakes within the reservation. The Tribal Council reviewed Mayo's recommendations and the underlying Fish Hatchery Report (dkt. #13-1), which showed walleye and muskellunge have experienced population declines based on a 2025 population study in some of the reservation lakes. Mayo also reported to the Council that forward trolling and forward-facing sonar methods of fishing were particularly adept at catching walleye and muskellunge.

However, the Tribal Council did not contact the State of Wisconsin's DNR regarding Mayo's findings in the Fish Hatchery Report. If they had, the State likely would have raised questions about the reliability of those findings. Responding to Mayo's report for purposes of opposing the Band's position in particular, the State submitted the declaration of Joseph Hennessy, a Natural Resource Staff Specialist for the Wisconsin DNR Bureau of Fisheries Management and co-leader of the DNR Walleye Management Team. (Dkt. #28.) According to Hennessy, Mayo's report not only lacks important details regarding the methodology of his studies, but even if Mayo's numbers were accepted, they do not raise significant concerns about walleye and muskellunge populations on the few lakes studied to date. More specifically, the report does not show that fishing *by non-members* is a cause of any overall decline in fish populations. (*Id.* ¶ 27.) Hennessy also describes several methods for walleye rehabilitation

aside from fishing bans, which he opines should ideally be crafted with the support of all affected parties. (*Id.* ¶ 37.) Finally, Hennessy explains that data collected by the state shows that anglers using trolling and sonar methods do not actually catch more fish than anglers using casting techniques. (*Id.* ¶¶ 58, 66.)

Nevertheless, on March 30, 2026, relying on Mayo's preliminary report and opinions, the Tribal Council adopted Resolution 8(26), approving the closure of *nine* lakes to non-member walleye and muskellunge fishing and prohibiting forward trolling by non-members on all lakes within the reservation boundary. The Band also issued a media release regarding the resolution. On April 14, 2026, the Tribal Council adopted another resolution, Resolution Number 119(26), which amended Resolution 8(26) by expanding the closures and restrictions to nineteen Reservation lakes and adding a further prohibition on non-member use of "forward facing sonar." Following communications between state officials and tribal officials regarding Resolution 119(26), on April 27, 2026, the Band then issued Resolution 131(26), which copies much of the substance of Resolution 119(26), including purporting to: close nineteen lakes "to Walleye and Muskellunge fishing by non-members"; and "ban[ ] forward trolling and forward-facing sonar on all lakes within the reservation boundary by non-members." The resolution also provided additional findings in support of these closures and restrictions on fishing methods.

On April 27, members of the Tribal Council met with Wisconsin Department of Natural Resources Secretary Karen Hyun and Northern Wisconsin DNR Regional Director James Yach on the Reservation. Secretary Hyun and Director Yach told the Tribal Council that Governor Evers was gravely concerned about public safety in connection with the Band's lake closure

4

actions. The Tribal Council responded that it would consider further action under Tribal law to address the governor's concerns.

On April 29, the Tribal Council next adopted Resolution 132(26), which for the first time declares a "State of Emergency" under Chapter 56 of the Tribal Code, the Band's Emergency Management Ordinance. Based on the same data compiled by the Tribal Fish Hatchery and Natural Resources Department, Resolution 132(26) again purports to make findings that walleye and muskellunge populations in multiple lakes have declined to critically low levels and threaten the long-term viability of the species, as well as the health, safety and welfare of the Band and its members. The Resolution also designates the Director of the National Resources as the lead emergency official; runs for 30 days unless extended; and directs coordination with tribal, local, county, state and federal partners as appropriate. The Resolution also reaffirms the Band's openness to cooperative discussions regarding fishery management.

Wisconsin's 2026-27 general inland fishing season started a few days later, on May 2, 2026. If the court lifts its temporary restraining order, the Band intends to enforce Resolutions 119(26) and 131(26) against non-members who attempt to fish for walleye or muskellunge on nineteen designated navigable lakes or use the restricted methods on any reservation lakes, though defendants did not explain specifically how they would do so. Anglers and resort owners near the affected lakes have expressed concerns to the State's DNR about these restrictions affecting tourism and commerce, echoing concerns that culminated in ugly protests a generation ago, although neither side presented evidence of any actual confrontations between members of the public and on-reservation law enforcement in recent years when lakes were closed to non-member fishing-related activities.

OPINION

Preliminary injunctive relief is an "extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015); *see also Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, the State must show that: (1) it has "some likelihood of prevailing on the merits"; (2) traditional legal remedies would be inadequate; and (3) it will suffer irreparable harm without the relief. *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). If the State meets each of these threshold requirements, the court proceeds to a balancing analysis, weighing the harm that the State would suffer absent a preliminary injunction against the harm the Band would suffer were a preliminary injunction issued, as well as considering whether an injunction is in the public interest overall. *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 816 (7th Cir. 2018); *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

The State requests a preliminary injunction to prohibit the Band from enforcing any of the resolutions seeking to restrict the fishing rights of non-members as described above during the pendency of this case. The State's motion is principally based on the Band's actions being directly contrary to the Seventh Circuit's holding in *Baker*, while the Band relies on a narrow, so-called second exception recognized in *Montana v. United States*, 450 U.S. 544 (1981), that permits Bands to act when something "threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe." *Id.* at 566. In particular, the Band argues that while *Baker* was decided after *Montana*, it does not resolve the

6

dispute here under the *Montana* exception.  The court addresses the merits of these positions below.

## I.  Likelihood of Success on the Merits

The first question is whether the State has shown that it is likely to succeed on the merits of its claim under *Baker*.  "Some likelihood of success" is more than "a mere possibility of success," but "the applicant need not show that it definitely will win the case."  *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 844 (7th Cir. 2023).  As the court discussed with the parties at the preliminary injunction hearing, the State has certainly shown some likelihood of success on its claim that the Band's actions against only non-members on navigable waters within its territory are barred by the Seventh Circuit's opinion in *Baker*.

In *Baker*, the State challenged certain provisions of hunting, fishing and ricing code of the Lac Courte Oreilles Band of the Lake Superior Chippewa Indians that prohibited non-member fishing on navigable waters within the Reservation without a fishing license issued by the Lac Courte Oreilles Band.  698 F.3d at 1326.  The Seventh Circuit concluded that the State had exclusive jurisdiction to regulate non-member hunting and fishing activities on navigable waters within the reservation, reasoning that:  (1) the power to regulate fishing and hunting in navigable lakes was vested in the State of Wisconsin in 1848, when the State was admitted to the Union under the equal-footing doctrine; and (2) the United States neither intended to divest the State of this power nor convey it to the Lake Superior Chippewa Bands when it established reservations for them in the 1854 treaty.  *Id.* at 1333–34.  Given that the Lac du Flambeau Band's Reservation was also established in the 1854 treaty, the Seventh Circuit's legal reasoning and holding regarding the lack of tribal authority to regulate non-

member hunting and fishing applies equally to the Lac du Flambeau Band.  Thus, the Band's recent resolutions restricting fishing by non-members appear to run directly contrary to *Baker's* holding that "exclusive sovereignty over [navigable waters within the Reservation] is in the State." *Id.* at 1335.

Still, the Band argues that *Baker* should not control here, given that the case involved a different record and a different band of the Lake Superior Chippewa -- the Lac Courte Oreilles Band -- who did not raise some of the arguments asserted now.  To begin, the Lac du Flambeau Band now argues that it has "inherent sovereign authority" to regulate non-member fishing and hunting on the Band's reservation, which was *not* divested by the 1854 treaty or any other law. Relatedly, the Band argues that its own constitution and laws *grant* it authority to regulate non-members.  However, the Supreme Court already rejected both arguments, holding that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 328 (2008) (quoting *Montana*, 450 U.S. at 565).  Moreover, under this principle, the Band does not have inherent authority to give itself power to regulate others.  *Montana*, 450 U.S. at 564 ("[G]eneral principles of retained inherent sovereignty did not authorize the Crow Tribe to adopt Resolution [prohibiting hunting and fishing within the reservation by anyone who was not a member of the Tribe]").

Next, the Band here argues that the Lac Courte Oreilles Band involved in the *Baker* litigation did not make arguments about the 1854 treaty that it is now making, so the Seventh Circuit never reached them.  However, as the court explained at the preliminary injunction hearing, *this* court is nevertheless bound by the Seventh Circuit's interpretation of the 1854

treaty in *Baker,* as well as its holding of that case.  Perhaps the Band can persuade the Seventh Circuit to modify or overrule *Baker* on appeal, but this court has no such authority.

Even if *Baker* generally restricts the Band's lawful authority to regulate non-member fishing on navigable lakes within the Reservation, the Band further argues that the Supreme Court has acknowledged two instances in which Tribes may regulate nonmember conduct, widely known as "the *Montana* exceptions."  Relevant here, the second *Montana* exception allows concurrent tribal regulatory authority over non-member conduct on fee land within a tribe's reservation, but only where that conduct threatens the "political integrity, the economic security, or the health or welfare of the Tribe."  *Montana*, 450 U.S. at 566.  While the Band now contends that its fishing restrictions fall under the second *Montana* exception, because non-member fishing of walleye and muskellunge on reservation lakes threatens or directly affects its "political integrity, economic security, or health or welfare," the Supreme Court has held that for this exception to apply, the challenged conduct cannot merely injure a Tribe but must "imperil the subsistence" of the tribal community such that "tribal power must be necessary to avert catastrophic consequences."  *Plains Com.*, 554 U.S. at 341 (citation and internal quotation marks omitted); *see also FMC Corp. v. Shoshone-Bannock Tribes*, 942 F.3d 916, 935 (9th Cir. 2019) (to fall under a tribal regulation, "[t]he activities must 'imperil the subsistence or welfare' of the tribal community.'")  Moreover, *the Band* has the burden to establish this exception would apply, *Plains Com. Bank*, 554 U.S. at 330, and "that burden is difficult to meet."  *McGowan v. Tix*, 161 F.4th 1118, 1124 (8th Cir. 2025) (defendant had failed to establish tribal court authority over a divorce petition under *Montana* exception); *see also Plains Com. Bank*, 554 U.S. at 330 ("efforts by a tribe to regulate nonmembers . . . are 'presumptively invalid'") (quoting *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 659 (2001)).

To date, the Band has not even come close to showing that non-member fishing of walleye and muskellunge on Reservation lakes is necessary to avert catastrophic consequences.  At most, a single declaration from a lone Band natural resource specialist has noted a decline in walleye and muskellunge on a few lakes within the reservation (a pattern that is part of a larger trend showing up in some other, fresh water lakes around the State and under study as to possible causes), but is in no way yet considered any kind of catastrophic cliff for either fish population.

Thus, although the Band submitted evidence that its members rely on walleye and muskellunge as a food source and revere both fish, especially the walleye, as culturally significant, it submitted little to no evidence that non-member fishing, trolling or use of forward-facing sonar would result in catastrophic consequences for the Band.  Indeed, the Band's primary evidence of the potential consequences is the 8-page 2025 report completed by Tribal Fish Hatchery staff, which covers only one-year of monitoring and is wholly insufficient to suggest catastrophic consequences will arise unless nineteen lakes are suddenly and indefinitely closed to certain types of fishing by non-members.  Instead, state fisheries staff persuasively explained why the Band's Fish Hatchery Report was "unremarkable," critically lacking both "procedurally and interpretatively," and did not demonstrate that walleye or muskellunge are experiencing "critical declines."  (Hennessy Decl. (dkt. #28) ¶ 26; *see also id.* ¶¶ 24–29.)   The State's fisheries staff also found the Band's attempt to restrict non-members' methods of fishing (forward trolling and forward-facing sonar) to be, at best, factually unsupported, and more likely, "ineffectual for [its] asserted purposes."  (*Id*. ¶¶ 51–70.)

Finally, the Band argued at the preliminary injunction hearing that the Supreme Court's decision in *United States v. Cooley*, 593 U.S. 345, 349–53 (2021), supports its enactment of incremental, narrowly tailored resolutions to address potential harm to tribal interests.  On its

face, however, *Cooley* is inapposite, as it did not involve a tribe attempting to subject a non-member to tribal law.  Rather, in *Cooley*, the Supreme Court held that a tribal police officer had authority to search and detain for a reasonable time any person he or she believes may commit or has committed a state or federal crime.  *Id.* at 353 ("Saylor's search and detention, however, do not subsequently subject Cooley to tribal law, but rather only to state and federal laws that apply whether an individual is outside a reservation or on a state or federal highway within it.").  As the Supreme Court explained, without such authority, tribes would have difficulty "protect[ing] themselves from ongoing threats," such as "drunk drivers, transporters of contraband, or other criminal offenders operating on roads within the boundaries of a tribal reservation."  *Id.* at 351.[2]  In contrast, the Band here is attempting to subject non-member anglers to tribal law based on slim evidence that it will face comparable, catastrophic consequences such as those presented by potential criminal offenders operating on a reservation.  In short, the Band has not provided any persuasive reason why *Baker* does not still control the outcome here.  Thus, the State has shown a substantial likelihood of success on the merits of its declaratory judgment action.

## II.     Lack of Legal Remedies and Irreparable Harm

---

[2] Contrary to defendants' assertions at the evidentiary hearing, *Cooley* likewise includes no discussion of a tribe's authority to take "incremental" steps to regulate non-tribal members. However, even if *Cooley* could be interpreted as somehow approving incremental tribal regulation of non-tribal members, it appears to have been done precipitously here.  Indeed, the Band took unilateral action on short notice to close nineteen lakes to all walleye and muskellunge fishing by non-tribal members without adequately consulting the State's DNR, determining any causal relationship, or, apparently, considering less restrictive or abrupt alternatives.

The State likewise has shown that it has "no adequate remedy at law" and that without injunctive relief it will likely suffer irreparable harm. *Finch*, 82 F.4th at 578. Specifically, as the Band itself concedes, an intrusion on a State's sovereignty over its territory constitutes irreparable harm. *See Kansas v. United States*, 249 F.3d 1213, 1227–28 (10th Cir. 2001) (where an action places a state's "sovereign interests and public policies at stake," the "harm the State stands to suffer [is] irreparable"). Because the State has the power as a sovereign to regulate hunting and fishing in navigable lakes in this State, whether within or outside a tribe's territory, *Baker*, 698 F.2d at 1335, the Band's attempt to assert jurisdiction over certain of its lakes within its reservation infringes on the State's sovereignty. Additionally, the court is persuaded that the risk of conflict and public confusion resulting from the Band's precipitous resolutions on the eve of the opening of fishing season is more likely than not to invite irreparable harm as well.

### III.   Balance of Harm and the Public Interest

The remaining factors for issuing a preliminary injunction also favor the State. Again, aside from the potential, though largely unsubstantiated, harm to walleye and muskellunge populations from non-member anglers, the Band has identified no risk of harm to itself or the public that would flow from a temporary injunction. In contrast, the potential harm to the State and public arising from the conflicts, public confusion, and legal uncertainty, let alone the harm to anglers from closing lakes to walleye and muskellunge fishing during the 2026 season, are significant. Even if these harms were not substantial, allowing such a last-minute disruption of the status quo that has held for generations is without justification absent better research and meaningful balance between the State and the Band. Accordingly, the court is

persuaded that the balance of equities all weighs heavily in favor of the State and the public. Therefore, a preliminary injunction will be entered allowing non-members to continue to fish on navigable waters.

## ORDER

IT IS ORDERED that:

1) Plaintiff State of Wisconsin's motion for preliminary injunctive relief (dkt. #4) is GRANTED as follows:

> Defendants are preliminarily enjoined from enforcing the Lac du Flambeau Band of Lake Superior Chippewa Indians Tribal Council's Resolutions 8(26), 119(26), and 131(26), or any other resolution by the Band that purports to restrict non-member fishing rights on navigable waters during the pendency of this litigation.

2) Under Fed. R. Civ. P. 65(c), plaintiff shall not be required to post a bond at this time.

Entered this 17th day of June, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

13